UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

INTERNATIONAL MILLENNIUM
CONSULTANTS, INC.,

                Plaintiff,                   Civil Action No.
                                          08-CV-11303

vs.

                                         PAUL D. BORMAN
TAYCOM BUSINESS SOLUTIONS, INC.,          UNITED STATES DISTRICT
                                          JUDGE

                Defendant.
_____/

## OPINION AND ORDER GRANTING PLAINTIFF'S MOTION TO PIERCE TAYCOM BUSINESS SOLUTIONS, INC.'s CORPORATE VEIL and ENTERING JUDGMENT AGAINST TAYCOM BUSINESS SOLUTIONS, INC., DANTE AND VONNITA BISHOP, AND INNOSYNTH, JOINTLY AND SEVERALLY

## I. INTRODUCTION

This is a breach of contract case. Plaintiff International Millennium Consultants, Inc. ("IMC") provided technology consulting services to Defendant Taycom Business Solutions, Inc. ("Taycom"). Taycom stopped paying IMC. IMC filed the present breach of contract suit on March 26, 2008, seeking to recover money owed for unpaid consulting services rendered.

On May 28, 2008, Taycom filed a counterclaim against IMC alleging breach of contract and tortious interference with business relations. Taycom alleged that IMC violated the terms of the parties' contract by arranging for direct placement of personnel with Taycom's clients, including Federal Mogul and Merrilat. Taycom further alleged that by placing personnel with Federal Mogul and Merrilat, IMC wrongfully interfered with Taycom's business relationships, causing Federal Mogul and Merrilat to stop doing business with Taycom.

1

On September 17, 2009, following arbitration of the dispute, the Court entered judgment in favor of IMC and against Taycom "in the amount of $97,252.36, plus pre-judgment interest . . . and post-judgment interest . . ." The judgment is against Taycom only – the sole named defendant herein.

Now before the Court is IMC's Motion to Pierce the Corporate Veil of Taycom [docket entry 24]. IMC asks the Court to enter a judgment against the two individual owners of Taycom, Dante V. Bishop ("Dante") and Vonnita Bishop ("Vonnita"), and Innosynth Technologies, LLC ("Innosynth"), Dante's new company. IMC argues that Dante and Vonnita "have abused the corporate form of Taycom and used it as a mere instrumentality to perpetrate fraud" and that, consequently, the Court should "disregard the corporate form of Taycom and enter judgment against Dante Bishop and Vonnita Bishop." With respect to Dante's new company, Innosynth, IMC argues that Innosynth "should share joint and several liability with Dante Bishop and Vonnita Bishop, because Dante Bishop transferred assets from Taycom to Innosynth after litigation between IMC and Taycom had commenced."

This matter has been fully briefed and the Court heard oral argument on February 17, 2010. For the reasons that follow, IMC's Motion to Pierce the Corporate Veil of Taycom will be granted.

## II.  BACKGROUND AND PROCEDURAL HISTORY

### A.

This action was filed on March 26, 2008. Taycom filed its counterclaim on May 28, 2008. On June 27, 2008, IMC filed a Motion to Compel Arbitration and Stay Proceedings, *see* docket entry 8, which the Court granted on December 15, 2008. *See* docket entry 16.[1] Pursuant to the parties'

---

[1] On the same day, December 15, 2008, the Court issued an order administratively closing the case for statistical purposes. *See* docket entry 17.

contract, and the Court's interpretation thereof, this dispute proceeded to arbitration before the American Arbitration Association. On August 26, 2009, the arbitrator, Sheri B. Cataldo, issued an arbitration award, a copy of which is attached as Exhibit B to IMC's motion. The award disposes of the parties' claims as follows:

## AWARD OF ARBITRATOR

* * * *

As to the claims of [IMC]:

1.    In favor of [IMC] and against Respondent Taycom . . . for breach of its payment obligation, including pre-judgment interest, in the amount of $97,109.10.

2.    Zero dollars against . . . Taycom . . . and Dante V. Bishop for fraudulent and/or innocent misrepresentation.

3.    In favor of . . . [IMC] and against Taycom . . . for reasonable attorney fees, costs and interest in the amount of $22,405.76.

As to the claims of [Taycom]:

1.    In favor of . . . Taycom and against [IMC] for set off in the amount of $25,000.

Accordingly, it is awarded as follows:

Taycom . . . shall pay to . . . [IMC] the sum of $94,514.86.

* * * *

This award is in full resolution of all claims and counterclaims submitted to this arbitration. All claims not expressly granted herein are hereby denied.

Def.'s Ex. B.

## B.

Following the issuance of the arbitration award, the parties filed a stipulated order, which

was entered by the Court on September 17, 2009, lifting the stay and confirming the arbitration award. *See* docket entry 23. The order states, in pertinent part, as follows:

<u>**JUDGMENT IN FAVOR OF PLAINTIFF/COUNTER-DEFENDANT AND AGAINST DEFENDANT/COUNTER-PLAINTIFF**</u>

* * * *

This matter comes before the Court by way of stipulation of the parties; and the Court being fully advised in the premises:

NOW, THEREFORE, IT IS HEREBY ORDERED AND ADJUDGED that:

(1)     JUDGMENT shall be and hereby is entered against . . . Taycom in the amount of $97,252.36, plus pre-judgment interest from August 26, 2009 until the date this Judgment is entered and post-judgment interest from the date this Judgment is entered until Taycom satisfies this Judgment in full.

(2)     IMC is entitled to attorney fees and costs that accrue from August 26, 2009 until Taycom satisfies this Judgment in full.

(3)     In accordance with Fed. R. Civ. P. 62(a), execution may issue on this Judgment 10 days after its entry and this Court retains jurisdiction to assist IMC's collection efforts against Taycom.

(4)     This Judgment disposes of the last remaining claim and closes the case, subject to the retention of jurisdiction referenced above.

Docket entry 23.[2]

### C.

On October 1, 2009, IMC conducted a creditor's examination of Taycom. Dante appeared as Taycom's representative. The transcript of the examination is attached as Exhibit C to IMC's motion. The following pertinent, undisputed facts can be gleaned from Dante's testimony:

---

[2] Taycom states in its brief that "[t]here are now two other judgments against Taycom, one for $63,000 and one for $42,500."

- In 1993, Dante graduated from Michigan State University with an undergraduate degree in accounting. Dante Bishop Dep. at 18.

- Dante worked as an auditor at Arthur Anderson in Detroit from 1993 until 1996. *Id*. at 19.

- Dante left Arthur Anderson and began working for Focus Hope. *Id*. at 19-20. While working for Focus Hope, Dante earned his certified public accountant designation from Michigan State University in 1995 or 1996. *Id*. at 20.

- After leaving Focus Hope, Dante and his wife, Vonnita, established Taycom in 1997. *Id*. at 22.

- In 1997, the year Taycom was founded, Dante owned 92% of the shares of Taycom and Vonnita owned the remaining 8%. *Id*.

- Dante served and Taycom's president and Vonnita served as Taycom's vice-president. *Id*. at 23.

- Dante capitalized Taycom with $30,000 of his own funds taken from his personal savings. *Id*. at 23-25.

- New capital was injected into Taycom after its founding, "[l]ikely on multiple occasions as the business required additional capital." *Id*. at 24. The new capital came from assets owned by Dante and Vonnita personally. *Id*. at 24-25.

- In 2006, the Bishops received a combined salary of approximately $50,000 from Taycom. *Id*. at 70.

- In 2007, the Bishops received a combined salary from Taycom of approximately $190,000 ($120,000 to Dante and $70,000 to Vonnita). *Id*.

- In 2008, the Bishops received a combined salary from Taycom of approximately $8,000. *Id*.

- In 2009, the Bishops did not receive a salary from Taycom. *Id*. at 70-71.

- The Bishops reside at 24141 Elizabeth Lane, Novi, Michigan 48374. *Id*. at 10. Dante and Vonnita are both on the title of the home, *id*. at 38, but the mortgage is in Dante's name only. *Id.*; *See also* IMC Ex. E ("General Property Information" listing Dante and Vonnita as the owners of the above-described property). Taycom is not a borrower on the mortgage note, nor is it on the title with Dante and Vonnita. Dante Bishop Dep. at 109.

- The Bishops' monthly mortgage payment is approximately $3,669. *Id*. at 104.

- Taycom made mortgage payments on the Bishops' home "often" – "over ten times" and "possibly" over 50 times. *Id*. at 104-105. When asked why Taycom paid his personal mortgage, Dante testified as follows: "Because Taycom owed me for compensation and salary not paid through W2; and because I did not W2 myself salary and funds that were held by Taycom, Taycom instead paid certain obligations for me." *Id*. at 99. According to Dante, having Taycom make the mortgage payment was "the most convenient mechanism," *id*. at 99, and Taycom "owes [Dante] a lot of money to this day." *Id*. at 109.

- Dante estimates that from 2007 through mid-2008, the Bishops made the "predominance" of the mortgage payments. *Id*. at 106. However, prior to 2007 and after mid-2008, Taycom paid the mortgage on behalf of the Bishops more often. According to Dante, "it's sporadic with regard to who made the payments" prior to 2007 and after mid-2008. *Id*. at 107.

- The following colloquy ensued between Dante and IMC's attorney:

  Q:     I don't see and I don't understand why Taycom is assuming your individual liabilities.

  A:     It's not – it never assumed the liabilities. It paid for – it paid the dollars due for liabilities.

  Q:     But it should have paid you and you should have paid tax on those monies to the government and then you should have paid your own personal liabilities. What you have done is subverted and avoided paying tax on monies owed to you by Taycom?

  A:     That's possible.

  Q:     That's illegal.

  A:     I'm not sure of that.

  Q:     You have under oath admitted to having Taycom pay your personal liabilities so that you could avoid paying tax.

  A:     No, that's not what I have admitted. You have stated for avoidance of paying tax. What I have stated is Taycom has paid for some obligations of mine from proceeds that they owed me directly. The tax discussion is its own discussion that has its own merits, inputs and outputs, but that's – and its conclusion, whether proper or improper I'm not sure. I've only stated the facts. You've stated assumption of intent. It's an assumption of intent.

- Dante is "not very" familiar with taxes: "I don't do taxes whatsoever as a CPA. I don't have a tax emphasis. I have a CPA that does all of my taxes." *Id*. at 101-102.

- In September 2009, Taycom paid Dante's personal mobile phone bill, which was approximately $900, and "possibly paid" the Bishops' personal electric bill at their Novi residence, which was approximately $500. *Id*. at 119-120.

- It is "highly probable" that, prior to September 2009, Taycom paid various third parties on behalf of Dante and Vonnita personally. *Id*. at 121. The following chart summarizes Dante's testimony:

| Year | Estimated Amount That Taycom Paid On Behalf of the Bishops Personally |
|------|------|
| 2009 | $15,000 |
| 2008 | 55,000 |
| 2007 | 5,000 |
| 2006 | 30,000 |
| 2005 | 30,000 |
| 2004 | 30,000 |
| 2003 | 10,000 |
| 2002 | 10,000 |
| 2001 | 5,000 |
| 2000 | 5,000 |
| 1999 | 5,000 |
| 1998 | 5,000 |
| 1997 | 0 |
| TOTAL: | $205,000 |

*Id*. at 127-129.

- Dante founded Innosynth in approximately August or September 2008. *Id*. at 74. Innosynth is in the business of "develop[ing] web applications for prospective licensing to clients." *Id*. at 73. Dante is the sole member of Innosynth. *Id*.

- No one has injected any capital into Innosynth. *Id*. at 75-76. Innosynth does not have a bank account. *Id*. at 75.

- Dante testified that he "has personally paid for things on behalf of Innosynth as Dante." *Id*. at 76. For example, Dante testified that, in his capacity as a member of Innosynth, he directed that money be transferred to an individual named Prince Gupta. The money transfers to Gupta are discussed on pages 77-81 of Dante's deposition. In sum, Dante transferred a total of approximately $10,000 to Gupta via check and/or money orders, on four separate occasions, from either his own personal bank account or that of Taycom. As stated by Dante: "I believe the total amount remitted to Mr. Gupta was $10,000. And the transactions that we summarized thus far are – represents that $10,000 with uncertainty as to check or wire [transfer] or [from the accounts of] Bishop or Taycom,

specifically understanding it was check and wire, Bishop and Taycom accounts." *Id*. at 80-81.

## D.

On November 25, 2009, IMC filed the present motion asking the Court to pierce the corporate veil of Taycom and enter judgment against Dante and Vonnita, and Innosynth, jointly and severally, for the judgment amount entered by this Court against Taycom on September 17, 2009.

## III.  ANALYSIS

### A.  The Parties' Arguments

### 1.  IMC's Position

IMC argues that Dante and Vonnita "have abused the corporate form of Taycom and used it as a mere instrumentality to perpetrate fraud" and that the Court should "disregard the corporate form of Taycom and enter judgment against Dante Bishop and Vonnita Bishop."  In support of its argument, IMC points out that, by Dante's own admission, Taycom repeatedly made mortgage payments on the Bishops' personal residence "over ten times" and "possibly" over 50 times.  As stated by IMC,

> [b[y directing Taycom to make the mortgage payments, the Bishops intentionally avoided the payment of Federal and state income taxes.  Such conduct is fraudulent and perhaps criminal.  The Bishops abused Taycom's corporate form and used it to commit fraud.  As a result, IMC incurred an unjust loss because IMC should have received the money used to pay the Bishops' personal mortgage.  Accordingly, Taycom's corporate veil should be pierced to hold the Bishops jointly and severally liable to IMC.

IMC Br. at 7.

IMC also points out that Taycom has paid third parties for expenses incurred by the Bishops personally, as the chart above illustrates.  As stated by IMC,

> Taycom's payment of personal expenses resulted in the Bishops' failure to

> pay income taxes; conduct that is fraudulent and perhaps criminal. Instead
> of paying its obligations to IMC, Taycom paid the Bishops' personal
> expenses. Thus, the Bishops once again used Taycom as an instrument to
> commit a fraud or wrong resulting in IMC's unjust injury. Such conduct
> warrants the piercing of Taycom's corporate veil.

*Id*. at 8. In support of its argument that the Court should pierce Taycom's veil and enter judgment

against Dante and Vonnita personally, IMC relies mainly upon the Sixth Circuit's decision in *Servo*

*Kinetics, Inc. v. Tokyo Precision Instruments Co. Ltd.*, 475 F.3d 783 (6th Cir. 2007).

Finally, IMC asks the Court to enter judgment against Innosynth because Dante "transferred

assets from Taycom to Innosynth after litigation between IMC and Taycom had commenced." IMC

cites no authority in support of this request. IMC argues only as follows:

> Mr. Bishop created Innosynth when litigation between IMC and Taycom was
> pending. Mr. Bishop transferred $10,000 from Taycom to Innosynth when
> Taycom had monetary obligations to IMC. Clearly, Mr. Bishop cleared
> assets away from Taycom to avoid its obligations to IMC. This conduct is
> a clear abuse of the corporate form to avoid a legal obligation and should
> justify the piercing of Taycom's corporate veil to hold the Bishops and
> Innosynth liable to IMC.

IMC Br. at 8.

### 2. Taycom's Position

Taycom argues that its corporate veil should not be pierced because it was not operated as

a "mere instrumentality" of Dante but rather "was a properly functioning corporation." In support

of its argument, Taycom attaches its tax returns and financial statements,[3] which, as stated by Dante

in his affidavit, purportedly show that Taycom "entered into contracts in its own name, such as the

one with [IMC]," "entered into leases," "hired staff and paid the appropriate taxes," and "carried

---

[3] The tax and financial statements are attached as Exhibit B to Taycom's response brief.

insurance." *See* Dante Aff. at ¶ 12.[4]

Moreover, Taycom admits that it paid "some of Mr. Bishops' bills directly" but argues that this fact "is not relevant to the [piercing] inquiry" because "Mr. Bishop was entitled to receive compensation, either directly or indirectly, from Taycom, as well as repayment of loans." According to Taycom,

> [i]n the end, so long as all of these payments were properly reported by Mr. Bishop's CPA, which Mr. Bishop believes is the case, then this [is] a non-issue. Neither Taycom nor Mr. Bishop has heard of any complaints from the IRS or their banks and mortgage companies, all of which have reviewed their financial information and documents.

Taycom further emphasizes that it "made an accounting record of payments made by and to Mr. Bishop that included payments made on his behalf, such as his mortgage" and that, therefore, "[a]mounts paid for Mr. Bishop's mortgage were properly accounted for as a repayment to him of his outstanding loan." Taycom acknowledges that "in theory, there could have been two checks, one from Taycom to Mr. Bishop in repayment and another from Mr. Bishop to his mortgage company," but states that "the accounting treatment was nonetheless proper." In sum, Taycom argues that "there is no evidence [that] Taycom was a 'mere instrumentality' of Mr. Bishop." Taycom cites no case law or authority of any kind in support of its argument.

Taycom also states that IMC cannot demonstrate that Taycom committed fraud. As stated by Taycom: "the Arbitrator has already rejected IMC's fraud claim" and "IMC offers no reason why this Court should disturb the Arbitrator's decision." Alternatively, Taycom argues that,

> [i]n any event, IMC does not explain how payments for the benefit of the Bishops could constitute fraud on IMC, especially since: (1) those payments go back many years, far before the relationship between IMC and Taycom; (2) Mr. Bishop was entitled to compensation and dividends . . . ; and (3) the

---

[4] Dante's Affidavit is attached as Exhibit C to Taycom's response brief.

payments were properly accounted for.

Finally, Taycom argues that "there is no legal basis for finding Mrs. Bishop or Innosynth . . . liable." As stated by Taycom, "[t]hey are not parties to this case" and "IMC cannot establish that the funds paid on behalf of Innosynth to accomplish a transfer of intellectual property came from Taycom."

### 3. IMC's Counter-Argument

In its reply brief, IMC argues that Taycom's payments of the Bishops' personal liabilities, including the mortgage payments, were not compensation, as Taycom asserts in its response brief. As stated by IMC,

> [t]he mortgage payments were not compensation to Dante Bishop. Importantly, Taycom does not attach any W-2 Wage and Tax Statements which Taycom would and should have issued to Dante Bishop to evidence Taycom's payment of the mortgage payments of the Bishops' personal residence as compensation to Dante Bishop . . . . Thus, the only logical conclusion one draws from Taycom's conspicuous lack of W-2 documentation is that Taycom did not issue any such W-2 statements to Dante Bishop showing the mortgage payments as compensation to Dante Bishop. Because there are no such W-2 statements, Dante Bishop may well have acted fraudulently by evading and avoiding the payment of income taxes on those tens of thousands of dollars in personal liabilities of the Bishops' which Taycom paid. Thus, Taycom is merely an instrument of the Bishops' fraud and this Court should pierce its corporate veil.

IMC also states that

> [t]he meeting minutes should reflect the compensation of Taycom's executives and directors, if any, and also any meaningful changes in the compensation of those individuals. If Taycom were increasing the compensation of Dante Bishop to include the Bishops' $3,669 mortgage payments for their personal residence, the meeting minutes should reflect this substantial increase.

IMC argues that the absence of meeting minutes from this record suggests that none exist; and "[i]f Taycom fail[ed] to observe proper corporate formalities as required under Michigan law, it should

not reap the benefits attendant to corporate status."

Similarly, IMC states that the mortgage payments were not dividends, nor were they repayments of loan obligations. As stated by IMC,

> [i]f the payments were dividends which Taycom paid to Dante Bishop, one might expect to see something like "Taycom dividends" reflected on the personal income tax returns of the Bishops for the relevant time periods. Again, such returns are not attached to—nor are they referenced in—Taycom's response papers.

According to IMC, "[t]he absence of such documentation at least suggests that it does not exist."

Finally, IMC argues that Taycom's payments of the Bishops' personal liabilities did not constitute the repayment of loan obligations. As stated by IMC,

> [i]f the mortgage payments were the repayment of obligations, one might expect to see loan documents associated with such alleged obligations . . . . Again, the absence of such supporting documentation in the face of a motion to pierce Taycom's corporate veil indicates that no such documentation exists, and that the payments were not merely the repayment of loans which the Bishops had made to Taycom.

## B. Law

"Generally, the law treats a corporation as an entirely separate entity from its stockholders, even where one person owns all of the corporation's stock." *Kline v. Kline*, 104 Mich. App. 700, 702 (1981) (per curiam). "Under Michigan law, there is a presumption that the corporate form will be respected." *Servo Kinetics, Inc.*, 475 F.3d at 798 (citing *Seasword v. Hilti*, 449 Mich. 542, 547 (1995)). *See also* Stephen H. Schulman, et al., *Michigan Corporation Law & Practice* § 3.9(c), p. 60 (2008 Supp.) ("only unusual circumstances justify disregarding the corporate entity"). "This presumption, often referred to as a 'corporate veil,' may be pierced only where an otherwise separate corporate existence has been used to "subvert justice or cause a result that [is] contrary to some other clearly overriding public policy." *Seasword*, 449 Mich. at 548 (quoting cases) (alteration in

original).

As stated by the Sixth Circuit, "Michigan courts will not pierce the corporate veil unless (1) the corporate entity was a mere instrumentality of another entity or individual; (2) the corporate entity was used to commit a fraud or wrong; and (3) the plaintiff suffered an unjust loss." *Servo Kinetics, Inc.*, 475 F.3d at 798 (citing cases). According to one treatise, "there are relatively few cases in Michigan applying this tripartite analysis . . . and it still remains for the courts to elaborate on when the three tests will be found to be satisfied." Stephen B. Presser, *Piercing The Corporate Veil* § 2.23, p. 2-274 (2004) (emphasis added).[5]

As stated by the Sixth Circuit,

> [i]n analyzing these three general factors, courts frequently consider more specific factors such as "undercapitalization of the corporation, the maintenance of separate books, the separation of corporate and individual finances, the use of the corporation to support fraud or illegality, the honoring of corporate formalities, and whether the corporation is merely a sham."

*Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. Aguirre*, 410 F.3d 297, 302-303 (6th Cir. 2005) (interpreting Michigan law) (quoting *Laborers' Pension Trust Fund v. Sidney Weinberger Homes, Inc.*, 872 F.2d 702, 704-705 (6th Cir. 1988)).

Additionally, the Michigan Court of Appeals has stated, in a seminal piercing case, that

> [c]omplete identity of interest between sole shareholder and corporation may lead courts to treat them as one for certain purposes. Where the corporation is a mere agent or instrumentality of its shareholders or a device to avoid legal obligations, the corporate entity may be ignored. A court may look through the veil of corporate structure to avoid fraud or injustice. The

---

[5] The Court notes "that it is relatively more difficult to pierce the corporate veil in Michigan than in many other states." Presser at § 2.23, p. 2-261. Moreover, the basic principles of veil-piercing law are broad and elusive enough in Michigan so that it is difficult to know precisely when the veil will be pierced, but the latest jurisprudence suggests that it will remain relatively difficult to pierce the veil in the state, in both contract and tort cases." *Id*. at p. 2-277.

> community of interest between corporation and shareholders may be so great that, to meet the purposes of justice, they should be considered as one and the same. When the notion of a corporation as a legal entity is used to defeat public convenience, justify a wrong, protect fraud or defend crime, that notion must be set aside and the corporation treated as the individuals who own it. The fiction of a corporate entity different from the stockholders themselves was introduced for convenience and to serve the ends of justice, but when it is invoked to subvert the ends of justice it should be and is disregarded by the courts. A court's treatment of a corporate entity clearly rests on notions of equity, whether it is an action at law or at equity. Each case involving disregard of the corporate entity rests on its own special facts.

*Kline*, 104 Mich. App. at 702-703 (citations omitted). Thus, "[t]he propriety of piercing the corporate veil is highly dependent on the equities of the situation, and the inquiry tends to be intensively fact-driven." *Servo Kinetics, Inc.*, 475 F.3d at 798 (citing cases). "In determining whether the corporate entity should be disregarded . . . , each case is sui generis and must be decided in accordance with its own underlying facts." *Herman v. Mobile Homes Corp.*, 317 Mich. 233, 243 (1947) (citing cases). *See also Aero-Motive Co. v. Becker*, No. 99-CV-384, 2001 WL 1699191, at *6 (W.D. Mich. Oct. 2, 2001) (unpublished) ("[t]he [veil-piercing] doctrine is especially applicable to situations in which the individual seeks to avoid his or her obligations, protect a fraud, or defend a crime by hiding behind the corporate entity"); *Herman*, 317 Mich. at 246 ("it comes down to a question of good faith and honesty in the use of the corporate privilege for legitimate ends").

In Michigan, piercing

> cases may be divided for analytical purposes into two categories. The first category includes traditional attempts by contract and tort creditors to disregard corporate entity, typically for purposes of obtaining recourse against the shareholders. The second category involves more unusual situations in which "reverse piercing" is attempted—that is, where the shareholder or the corporation seeks to deny the separate entity of the corporation.

Schulman at § 3.9(c), p. 60.1. The present case involves precisely the first of the two categories.

"In the first category of cases, there have been a significant number of decisions under

Michigan law that illustrate judicial attitudes toward creditor efforts to seek recourse against shareholders." *Id*. For example, in *Soloman v. W. Hills Dev. Co.*, 110 Mich. App. 257 (1981), the Michigan Court of Appeals held that "[d]isregard of corporate formalities alone is not . . . sufficient to justify piercing. In addition, fraud, illegality, or injustice need be shown as set forth in *Kline*."[6] 110 Mich. App. at 263. *See also Aero-Motive Co.*, 2001 WL 1699191, at *6 ("[f]ailure to follow corporate formalities alone is not sufficient to justify piercing the corporate veil").

Similarly, in *Maki v. Cooper Range Co.*, 121 Mich. App. 518 (1982), the Michigan Court of Appeals "held that the separate entity of a subsidiary is not to be disregarded unless it was a mere instrumentality of its parent, and the parent exercised its control in a manner to defraud or wrong plaintiff with resultant unjust loss." Schulman at § 3.9(c), p. 62 (footnote omitted).

> Cases such as *Solomon* and *Maki* suggest that the Michigan courts will normally require more than a disregard of corporate formalities or the domination of a corporation by its shareholders before the corporate entity will be disregarded. Some additional element pointing to the justice of such result should also exist.

*Id*.

"Another . . . illustration of appropriate circumstances for piercing is found in the Michigan Court of Appeals decision in *Sorensen v. Schuman*," No. 139785 (Mich. Ct. App. June 8, 1994). Schulman at § 3.9(c), p. 65. There, "[t]he appellate court reversed the trial court and disregarded the corporate entity when, among other factors, the corporation was 'grossly undercapitalized' and corporate assets were depleted after the shareholder received notice of the plaintiff's injuries and impending claim." *Id*. at § 3.9(c), p. 65-66.

---

[6] According to the treatise, "[t]he *Soloman* court's underscoring of the need to satisfy more than the 'formalities' or 'mere instrumentality' test appears to be an increasingly important feature of Michigan law." Presser at § 2.23, pp. 2-273-274.

In *Daymon v. Fuhrman*, No. 249007, 2004 WL 2238596, at *1 (Mich. Ct. App. Oct. 5, 2004) (per curiam) (unpublished), the appellate court upheld the trial court's determination that the defendant-shareholder was a "mere instrumentality" of his corporation when "[i]t was undisputed that for years defendant utilized the corporation to pay his personal bills." The Court of Appeals acknowledged the testimony of defendant's expert to the effect that "defendant properly accounted for each and every such transaction," but refused to disturb the trial court's finding that the defendant's "reconciliation of his 'personal revolving account' or 'shareholder loan account' with the corporation is unpersuasive." *Id.* Moreover, the appellate court concluded that "the record supports the trial court's finding that defendant's use of the corporate checking account was done without contemporaneous shareholder loan or corporate documentation." *Id.*

## C. Discussion

As noted above, "Michigan courts will not pierce the corporate veil unless (1) the corporate entity was a mere instrumentality of another entity or individual; (2) the corporate entity was used to commit a fraud or wrong; and (3) the plaintiff suffered an unjust loss." *Servo Kinetics, Inc.*, 475 F.3d at 798 (citing cases).

> In analyzing these three general factors, courts frequently consider more specific factors such as "undercapitalization of the corporation, the maintenance of separate books, the separation of corporate and individual finances, the use of the corporation to support fraud or illegality, the honoring of corporate formalities, and whether the corporation is merely a sham."

*Aguirre*, 410 F.3d at 302-303.

## 1. Taycom Was A "Mere Instrumentality" of the Bishops

As an initial matter, the Court notes that there is no evidence in the present case that Taycom was insufficiently capitalized. In fact, Dante's uncontroverted testimony reveals that he initially

capitalized Taycom with $30,000 of his own funds taken from his personal savings, Dante Bishop Dep. at 23-25, and that new capital was injected into Taycom after its inception, "[l]ikely on multiple occasions as the business required additional capital." *Id*. at 24.

Rather, IMC asks the Court to pierce the corporate veil of Taycom and hold the Bishops personally liable for Taycom's debts, jointly and severally with Taycom, based solely on the fact that the Bishops, by Dante's own admission, commingled personal funds with corporate funds. The record in this case contains the following uncontroverted evidence demonstrating that the Bishops used corporate funds to pay personal expenses, thereby blurring the distinction between Taycom, on the one hand, and the Bishops, on the other hand:

    (1)    Taycom paid the Bishops' monthly personal mortgage payment ($3,669 per payment) "often" – "over ten times" and "possibly" over 50 times, on a "sporadic" basis, over the course of many years.

    (2)    In September 2009, Taycom paid Dante's personal mobile phone bill, which was approximately $900, and "possibly paid" the Bishops' personal electric bill at their Novi residence, which was approximately $500.

    (3)    From 1997 through 2009, Taycom paid an estimated amount of $205,000 on behalf of the Bishops, personally.

This evidence clearly establishes that the Bishops repeatedly, over the course of many years, used corporate assets as if they were their own. Because the Bishops consistently failed to distinguish corporate assets from their own, the Court will do the same. *See Daymon*, 2004 WL 2238596, at *1 (upholding the trial court's determination that the shareholder was a "mere instrumentality" of his corporation when "[i]t was undisputed that for years defendant utilized the corporation to pay his personal bills").

Moreover, Dante testified that he understands that what he did "may be wrong," but denied, repeatedly, that he acted with a culpable state of mind. *See* Dante Bishop Dep. at 109 ("I understand

it may be wrong, but I have an issue with the question of intent though"); *id.* at 99 (denying that his intention was to avoid paying taxes). Based on the evidence of commingling discussed above, it is clear that Taycom was used as a "mere instrumentality" of the Bishops.

Additionally, the Court notes that Vonnita is also responsible for the commingling of assets. As stated by the Tenth Circuit, "the individual who is sought to be charged personally with corporate liability must have shared in the moral culpability or injustice." *Nat'l Labor Relations Bd. v. Greater Kansas City Roofing*, 2 F.3d 1047, 1053 (10th Cir. 1993). Here, Vonnita, in addition to Dante, is responsible for commingling assets inasmuch as Dante testified that it was Vonnita who actually "makes the mortgage payments" and directed that the personal mortgage payments be made by Taycom. Dante Bishop Dep. at 106. The record contains no evidence to the contrary.

Finally, the Court rejects the argument that Taycom paid the Bishops' personal expenses as compensation to the Bishops. This is Taycom's main argument in support of its position that its veil should not be pierced. However, the argument is unpersuasive because, as IMC notes repeatedly throughout its reply brief, Taycom has not pointed to any credible evidence demonstrating that Taycom's payment of the Bishops' personal expenses constituted compensation for services rendered by Dante and/or Vonnita. If it were true that Taycom's payment of the Bishops' personal mortgage and other personal expenses constituted compensation, dividends, or repayment of loans, as Taycom urges, Taycom could easily prove it simply by submitting relevant documentation such as loan papers, tax statements showing dividend distributions, W-2 forms, or the like. No such papers have been filed. As IMC notes, and the Court agrees, the absence of such crucial evidence in the face of the present motion is highly suggestive.[7]

---

[7] Attached as Exhibit B to Taycom's response brief is Taycom's Corporate Income Tax Return for 2006. However, Taycom does explain how this document supports its position that

## 2. Taycom Was Used To Commit A Wrong And, As A Result, IMC Suffered An Unjust Loss

The Court turns now to the second and third elements of the *Servo Kinetics, Inc.* framework – whether Taycom "was used to commit a fraud or wrong" and whether IMC suffered an "unjust loss" as a result. Regarding the former requirement, the Court notes that

> any illegality would suffice to establish this element. In fact, even conduct short of the illegal could support element two. Michigan law does not require a showing of fraud or illegality before the corporate form will be disregarded. "While there is no question that fraud justifies piercing the corporate veil, there is ample authority under Michigan law for finding parent corporation liability through veil piercing for less egregious unjustified use of the corporate form." *United States v. Cordova Chemical Co. of Mich.*, 59 F.3d 584, 597 (6th Cir. 1995) (Ryan, J. dissenting) (citing cases), *vacated by United States v. Bestfoods*, 524 U.S. 51, 118 S. Ct. 1876, 141 L. Ed.2d 43 (1998).

*Mich. Laborers' Health Care Fund v. Taddie Const., Inc.*, 119 F. Supp.2d 698, 703 (E.D. Mich. 2000).

Here, the evidence strongly suggests that the Bishops, over the course of years, misused the corporate form in a manner that has caused an unjust loss to IMC. As discussed at length above, the Bishops caused Taycom to pay their personal expenses not once, not twice – but dozens of times. As the chart on page 7, *supra*, illustrates, the estimated amount of money paid by Taycom on behalf of the Bishops, personally, is substantial – an estimated $205,000 from 1998 through 2009. Moreover, the great bulk of the money was paid recently, in the last six years, with Taycom paying $15,000 in 2009 and $55,000 in 2008. The record contains no credible evidence supporting

---

the payment of the Bishops' personal expenses constituted wages or loan repayments. Importantly, Taycom does not rely on the tax document to support that particular argument; rather, it relies on the tax document to support its argument that "Taycom was a properly functioning corporation."

Taycom's position that the payments made by Taycom on behalf of the Bishops, personally, were legitimate. Moreover, the manner in which the Bishops misused the corporate form in this case caused an unjust loss to IMC. As stated by IMC, and the Court agrees, "IMC incurred an unjust loss because IMC should have received the money used to pay the Bishops' personal mortgage" and other personal expenses.

IMC argues that the actions of the Bishops were fraudulent and possibly criminal. As stated by IMC, "[b]y directing Taycom to make the mortgage payments, the Bishops intentionally avoided the payment of Federal and state income taxes." In this regard, Dante testified as follows at his deposition:

> Q: Other than the avoidance of tax for monies paid to you by Taycom I don't see and I don't understand why Taycom is assuming your individual liabilities.
>
> A: It's – it's not – it paid the dollars due for liabilities.
>
> Q: But [Taycom] should have paid you and you should have paid tax on those monies to the government and then you should have paid your own personal liabilities. What you have done is subverted and avoided paying tax on monies owed to you by Taycom?
>
> A: That's possible.

Dante Bishop Dep. at 100-101.

The Court need not address this argument because, as discussed above, the Bishops' misuse of the corporate form provides a sufficient basis to satisfy the second element of the *Servo Kinetics, Inc.* framework. However, the Court notes that Taycom has not submitted any evidence rebutting IMC's accusations and, so far as the Court can tell on this record, it would appear that the Bishops avoided their tax obligations with respect to all expenses that were paid directly by Taycom. This provides an additional basis supporting the Court's conclusion that element two of the *Servo*

*Kinetics, Inc.* framework is satisfied. *See Aero-Motive Co.*, 2001 WL 1699191, at *6 ("[t]he [veil-piercing] doctrine is especially applicable to situations in which the individual seeks to avoid his or her obligations").

### 3. Judgment Should Also Be Entered Against Innosynth

Dante founded Innosynth in September 2008. In October 2009, more than a year after its creation, Dante testified that no one had injected any capital into Innosynth[8] and that it does not even have a bank account. *Id*. at 75-76. According to Dante,

> Innosynth . . . has not engaged in any transactions that have been recorded or acknowledged other than the transfer of the of . . . [intellectual property] to my servers which are in my custody. The only transaction that Innosynth has participated in is we have acquired the [intellectual property] without generating revenue, we have acquired assert servers from the previous client for one dollar. And I have not sent the dollar yet, so Innosynth has not had any financial interactions yet.

*Id*. Additionally, Dante testified that both himself, in a personal capacity, and Taycom, have paid for things on behalf of Innosynth – namely, Mr. Gupta's services. *Id*. at 75-81. Thus, Dante has treated himself (personally), Taycom, and Innosynth as one.

Because Dante has not distinguished between his own personal assets, the assets of Taycom, and the assets of Innosynth, the Court will also not make a distinction. Dante's failure to inject *any* capital into Innosynth more than a year after its founding, the fact that Innosynth does not have a bank account, and the fact that it has not engaged in ordinary business transactions, are all factors that militate very strongly in favor of piercing Taycom's veil and entering judgment against Innosynth. Of equal importance is the fact that Innosynth was created by Dante in September 2008,

---

[8] Dante testified that he has not capitalized Innosynth yet because he has not "set up a capital structure yet." Dante Bishop Dep. at 76.

while this litigation was pending.  All signs indicate that Innosynth is a sham.  Accordingly, the Court will pierce the corporate veil of Taycom, treat Taycom and Innosynth as one—just as Dante has done—and enter judgment against Innosynth.

## IV.  ORDER

For the reasons stated above,

IT IS ORDERED that IMC's Motion to Pierce the Corporate Veil of Taycom [docket entry 24] is granted.  Judgment in this matter is entered in favor of IMC and against Taycom, Dante, who is a C.P.A., and Vonnita Bishop, and Innosynth, jointly and severally.


s/Paul D. Borman\
PAUL D. BORMAN\
UNITED STATES DISTRICT JUDGE

Dated:  March 1, 2010

## CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on March 1, 2010.


s/Denise Goodine\
Case Manager